E. S. WOOD v. P. J. & R. S. WILLIS, AND ANOTHER.

1—A creditor living in Texas in 1862, being offered Confederate money in payment of his demand, at first refused to receive it, but at length did so unwillingly, and under circumstances which were controverted in the court below as amounting or not amounting to duress. *Held*, by this court, that the question of duress is not necessarily involved ; that the creditor had a perfect right to object to the payment of his demand in unlawful money, made and issued in aid of the rebellion ; and that his unwilling acceptance of it, objecting at the time, was no payment, the necessary element of his consent being wanting. *Held*, further, that the court below erred in not presenting the law of the case to the jury as it is here ruled, instead of submitting to them no other issue but one of duress.

ERROR from Harris. Tried below before the Hon. George R. Scott.

Wood, plaintiff in error, brought this suit in November, 1861, on a bill of exchange for $2,500, drawn by J. R. Morris on McIlhenny, Willis & Brother, and by them accepted. The bill was dated April 14, 1860, and was drawn by Morris, payable to his own order eighteen months after its date. The original petition alleged the indorsement by Morris before maturity of the bill. The suit was brought against the acceptors and the drawer; but McIlhenny died in 1863, leaving P. J. & R. S. Willis surviving partners of the firm of McIlhenny, Willis & Bro.

The suit stood over in court without action until after the war. In April, 1866, the plaintiff filed an amended petition, wherein he suggested the death of McIlhenny, and alleged that since the commencement of the suit the bill of exchange had got into the possession of the defendants without value and by unlawful means, so that he, the plaintiff, would be unable to produce it.

The defendants filed a general demurrer and a general denial, and answered payment in full, and especially that on the 12th of July, 1862, they fully paid the plaintiff in Confederate treasury notes, which were accepted by him in satisfaction of the bill.

The plaintiff, by amendment, denied the fact of payment, and alleged that he did not accept the Confederate treasury notes voluntarily; that he was forced to receive them by duress of martial law, and by threats of the defendants to arrest and imprison him if he refused them ; that martial law had been declared by Gen. Hebert, who was in command of the District of Texas, under an illegal organization called the Confederate States of America; that he ordered all persons to receive Confederate treasury notes at par, in payment of debts, on pain of arrest and punishment by a military commission, contrary to the laws both of the United States and the Confederate governments; that he had the power to enforce his

orders; and that the defendants had, by threats to have plaintiff arrested and punished, availed themselves of these orders, so that he was compelled to receive the said Confederate notes against his will. But he offered to allow their market value at the time as a credit on his demand.

Answering this amendment, the defendants alleged that the plaintiff had been a secessionist, and had sustained the Confederate organization in resisting the United States, while they, the defendants, had always been true and loyal citizens of the United States; that the plaintiff had accepted and exercised the office of deputy marshal of the Confederate States for the eastern district of Texas, and had himself paid out and received Confederate treasury notes, which were the common currency of the country; and that he, the plaintiff, had voluntarily and of his own free will, accepted the said notes from them, the defendants, in payment of the bill sued on, and had voluntarily surrendered the bill to them, acting without any fear or threats, other than the fear of public sentiment then prevailing against those who had set on foot the Confederate organization, and would not receive its money in payment of their claims, which public sentiment the plaintiff did not have the moral courage to resist.

The cause came to trial at the December term (1868). A large amount of evidence was adduced by the plaintiff to sustain his version of the transaction, and the defendants brought forward witnesses in support of theirs. If the case was treated by this court as turning on a question of duress, this evidence would be briefly set forth; but in view of the opinion of the court, and of the substantially conceded fact that the plaintiff had taken the Confederate money against his will, it is not deemed necessary to detail the evidence.

The charge of the court below to the jury was as follows:

"1. If the jury shall be of opinion from the evidence before them in this case that the plaintiff did, as alleged by the defendants, voluntarily and of his own free will, uninfluenced by force or fear of serious personal injury, receive from the

defendants Confederate States money in full satisfaction and discharge of said debt, then they will find a verdict for the defendant.

"2. If, however, the jury shall be satisfied from the facts before them in evidence, that the plaintiff was forced to accept payment of said debt in Confederate States currency; or that, in the absence of any actual force, the threat or fear of imprisonment, or of serious personal injury to himself, induced him to receive said currency in payment of the debt due to him from the defendants, then you will find a verdict for plaintiff in the amount of the original debt, deducting therefrom the market value of the Confederate currency paid to plaintiff in July, 1862.

"3. The fear of incurring public censure, or of having the finger of scorn pointed at him, if he refused to take Confederate money in payment of the debt, if not coupled with force or threats producing actual fear of personal danger to himself, will not entitle the plaintiff to a verdict in his favor.

"4. A mere threat to imprison, unaccompanied by the presence of force adequate to put the threat into execution, is not such duress as will relieve the plaintiff from the consequences of his act; and if it satisfactorily appears from the evidence that the plaintiff received payment of his debt in Confederate money, under influence of a mere threat only, which the party threatening had no present ability to execute, and that plaintiff knew this fact, then he is not entitled to be relieved by your verdict from the consequences of his act, and you will find for the defendants.

"5. In making up your verdict, you will consider the facts in connection with the payment alleged to have been made in this case; any other business transaction in which plaintiff may have taken Confederate money in payment of debts, you will wholly disregard, and will find upon the facts and circumstances of this particular transaction, as given in evidence before you."

At the request of the plaintiff the court gave some further

XXXII—42.

instructions on the subject of duress, but it is not necessary to copy them here.

The jury returned a general verdict for the defendants. Judgment was rendered according to the verdict, and a new trial asked for and refused. The plaintiff prosecutes his writ of error, assigning for error the charges of the court, the verdict, and the refusal of a new trial.

*P. W. Gray*, for plaintiff in error.—The law provides a judge for the very purpose of instructing a jury what is the law applicable to the case on trial. The statute declares that he may (which means *shall*, in this connection of duty imposed on an officer, in furtherance of justice between litigants—see Sedgwick on Statutory Law, 438; McDougal v. Patterson, 11 C. B., 755; The Mayor of New York v. Furze, 3 Hill, 612,) deliver a charge to the jury *on the law of the case*, but he " shall not comment on the weight of the evidence," and " he shall so frame his charge as to submit questions of fact solely to the decision of the jury, *deciding on and instructing them as to the law arising on the facts*," etc. (Paschal's Digest, Art. 1464.) The charges given in this cause do not clearly state the law. The attention of the court was called to the errors by the counter-charges asked, but were not remedied by them; and again on the motion for new trial, when the court still had power to afford relief, but refused it.

It is also assigned as error that the court refused a new trial because the verdict was contrary to law and evidence. What, then, is the law of duress, which will avoid the reception of a less sum of money than is due, as an involuntary act, and not a payment of the debt? And what were the facts?

Much that has already been said applies under this inquiry, and anticipates it. But we maintain that the law in equity does not require that the creditor shall be in actual imprisonment, or under actual force applied to his person; nor does it require that there should be an instant and immediate presence of such force, and immediate, imminent danger of its present

application to his serious personal injury or imprisonment, as was charged by the court. Such a doctrine may have suited the feudal ages and times when men went armed and prepared to meet force by force, but they have no application to the present state of society in civilized or enlightened nations, and much less to the case of a party acting in such a state of impotency of individuals as existed in Texas during the reign of martial law and its terrorism! No. The law only requires such a state of power and influence over a party as was presented in the counter-charges asked and given by the court; in brief, that there shall be power to arrest or imprison, and such threat to exert that power as was calculated to influence, and did influence, the party to act contrary to his real will.

The judge seems to have been governed by the old doctrine at law, as given by Blackstone, vol. 1, p. 131, that "duress *per minas* is either for fear of loss of life, or else for fear of mayhem, or loss of limb." The reason given is, that "both the life and limbs of a man are of such high value in the estimation of the law of England, that it pardons even homicide, if committed *se defendendo*, or in order to preserve them." Now we apprehend that in this free country of America, the liberty of a man's person is as highly regarded and esteemed, and its loss as much dreaded, as his limbs. Our law does not rest on such strict and narrow foundations.

Mr. Parsons, in his work on Contracts, says : "A contract made by a party under compulsion is void; because *consent* is of the essence of a contract, and where there is compulsion there is no consent, for this must be voluntary. Such a contract is void for another reason. It is founded on wrong. The violence was itself an injury to the parties suffering it; the party using the violence had no right to do so, and can not establish a right on his own wrong doing." Again : " This duress may be either actual violence or threat." " Duress by threats exist not wherever a party has entered into a contract under the influence of a threat, but only where such threat

excites a fear of some grievous wrong, as of death, or great bodily injury, *or unlawful imprisonment.* It is a rule of law, which is applied to many cases, that where the threat is of an injury *for which full and entirely adequate compensation may be expected from the law,* such duress will not, of itself, avoid a contract, for the threatened person *ought to have* sufficient resolution to resist the threat, and rely upon the law; *as where the threat is of an injury to property, or of a slight injury to the person.* But no verdict could compensate adequately for loss of limb, or for great personal violence, and no man shall be held bound to incur such a danger. *These distinctions, however, would not now probably have a controlling power in this country; but where the threat, whether of mischief to the person or the property, or to the good name, was of sufficient importance to destroy the threatened party's freedom, the law would not enforce any contract which he might be induced by such means to make.* And where there has been no actual contract, but money has been extorted by duress, under circumstances which give to the transaction the character of a payment by compulsion, it may be recovered back." (1 Parson, pp. 319–22. See, also, Story on Contracts, §§ 397, 398.)

Thus we find, even at law in this country, a more extended and reasonable view of the law of duress, than is asserted by the old common law writers. The principles are the same, but the reason of the law expands according to the changes in society, and character of the people in their onward growth. The principles here stated fully meet the case at bar.

The doctrine in equity is broader still, both in England and America. The subject of duress is treated there on the ground of actual fraud. Judge Story states it briefly in his Commentaries on Equity, vol. 1, § 239. He states that a party will be relieved in equity, " where he does an act, or makes a contract, when he is under duress, or the influence of extreme terror, *or of apprehensions short of* duress. For in cases of this sort he has no free will, but stands *in vinculis,* and the constant rule in equity is, that where a party is not a free

agent, and is not equal to protecting himself, the court will protect him."

Did not Wood stand *in vinculis?*   When martial law was over him, all other law being thereby suspended? When there was no law to protect him, save that very military law under which he was threatened? Was he a free agent when he could not come and go at his will, without military permit?   And when soldiers were stationed at every point of the city, where he resided?

In our own court it has been held " to invalidate a deed it is not necessary to prove that the threats of violence which were the inducement to the particular act, were made at the very *time* and *place* of the execution of the deed.   The *fear* must exist at the time of its execution, but the threats and circumstances inducing the act may be proven to have occurred at any antecedent time, and it is for the jury to say whether these threats and circumstances were sufficient to induce such fear as might move a man of ordinary firmness to the execution of the deed."   (Walker v. McNiels & Calder, Dallam, 544.)

This decision was made in a case arising when peace prevailed, the courts were open, and ample legal protection could have been obtained from them, against the power of individuals making threats of personal violence.   How much more applicable are its doctrines to the present case.

The following authorities are also considered in point:

" When a man executes a bond for fear of unlawful imprisonment, he may avoid it on the ground of duress."   (Whitfield v. Longfellow, 13 Maine, 149.)

" A deed or other instrument extorted from another by duress of imprisonment, or *threats of imprisonment*, may be avoided by the party executing it."   (Inhabitants of Worcester v. Eaton, 11 Mass., 379.)

" When a seaman is induced to assent to his discharge on payment of a nominal sum, from a just apprehension of future ill-treatment, arising from the misconduct of the master of the vessel, such assent is no bar to a recovery of the amount actually

due to him at the time of his discharge." (Bate v. Seabury, 1 Sprague's Decisions, 433.)

Upon these authorities as to the law of duress, we rest; and now submit that the payment made in this case was only of *part of the debt.* Forty cents on the dollar was the utmost value of the Confederate notes received by Wood, and even on the doctrines of Thorington v. Smith, recently decided by the United States Supreme Court, (reported in Am. Law Reg., vol. 8, n. s. p. 739,) would not discharge the debt upon an ordinary plea of payment. " Payment of part of a debt, or of liquidated damages, is no satisfaction of the whole debt, even where the creditor agrees to receive a part for the whole, and gives a receipt for the whole demand." But this rule does not include " a case of payment of a debt by a fair and well understood compromise, carried faithfully into effect." (2 Parson's Cont., 129,. 130, and cases cited in the notes.)

If, therefore, this payment shall be held valid, it must be on the ground of a fair settlement, and a clearly voluntary acceptance by Wood of the Confederate notes at their nominal face value. In other words, that he considered them as articles of value to him, at par, which he was willing to receive in full discharge of his just demand.

Does the evidence establish that proposition? Does it even tend in any degree to do so? On the contrary, does it not clearly show that he did not value the notes? and was specially unwilling to receive them in this particular case?

*Henderson & Whitfield,* for the defendants in error, cited on the question of duress, Walker v. McNeil, Dallam, 541; 6 Mass., 511; 3 Caines, 168; 1 Black. Com., 136; Bouvier's Law Dict., title Duress.

WALKER, J.—A want of time for extended comment upon the law and the evidence renders it necessary that this case shall be decided in few words.

The charge of the court was erroneous. The want of con-

sent on the part of Wood to the payment of the bill, in any manner and for any reason that the law gave him the right to except, rendered the payment void for want of his concurrence in it. The question of duress aside, the law gave him a perfect right to object to the payment of his debt in unlawful money, made and circulated in aid of the rebellion.

Such appears to have been the admitted fact, and the court should have so charged the jury.

The judgment is reversed and the cause remanded.

MORRILL, C. J.—In order that my opinion in this and kindred questions may not be misunderstood, I consider that in all cases where objections were made to receiving payment of a debt in Confederate money during the war, and these objections were made known to the debtor, who however availed himself of the military orders then in force, and thus required the creditor to accept unwillingly such payment, that such pretended payment was null.

Reversed and remanded.